UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANNE M. BYRNE,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**

TELESECTOR RESOURCES GROUP, INC.,                04-CV-0076S
d/b/a VERIZON SERVICES GROUP, a/k/a
VERIZON NEW YORK, INC.,

                              Defendant.

## I. INTRODUCTION

        Plaintiff Anne M. Byrne ("Byrne") commenced this action on February 2, 2004,

alleging that Defendant Telesector Resources Group, Inc., d/b/a Verizon Services Group,

a/k/a/ Verizon New York, Inc. ("Defendant" or "Verizon") discriminated against her based

on her sex, subjected her to a sexually hostile work environment, retaliated against her

following her complaints of discrimination and paid her less than male employees

performing the same duties, in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e *et seq.,* the New York State Human Rights Law ("HRL"), N.Y.

EXEC. L. §§ 290 *et seq.,* and the Equal Pay Act ("EPA"), 29 U.S.C. §§ 206 *et seq.* (Docket

No. 1).  Byrne subsequently filed an Amended Complaint on May 7, 2004.  (Docket No.

12.)  Certain of the claims set forth in the Amended Complaint were dismissed by this

Court's February 25, 2005 Decision and Order on Verizon's Motion to Dismiss.  (Docket

No. 21.)

1

Presently before this Court is Verizon's Motion for Summary Judgment[1] seeking dismissal of the Amended Complaint in its entirety.  (Docket No. 43.)  For the following reasons, Verizon's motion is granted in part and denied in part.

## II.  BACKGROUND

### A.    Facts

Verizon is a provider of telecommunication products and services.  (Docket No. 43-2 ("Def's Statement") ¶ 1.)[2]  Byrne was hired in or about December 1974 by a predecessor of Verizon, New York Telephone,[3] and spent the first 22 years of her employment working in union represented, hourly positions.[4]  (Docket No. 44, Ex. 1 ("Byrne Depo.") at 27:9-28:7.)  In March 1996, Byrne was asked to work on a temporary assignment in a salaried position in NYNEX's Systems Marketing Branch.  (Def's Statement ¶ 14.)  When the assignment concluded, in September 1996, Byrne was offered a permanent salaried Systems Analyst position in that department.  (Id. ¶ 16.)  She initially rejected the offer, but ultimately accepted the job after negotiating a higher starting salary.  (Id. ¶¶ 17-18; Docket No. 59 ("Pl's Statement") ¶¶ 17-18.)  In 1999, Byrne's Systems Analyst title was changed

---

[1]  In support of its Motion, Verizon filed a Local Rule 56.1 Statement of Material Facts (Docket No. 43-2), Local Rule 56.1 Appendix of Exhibits 1 - 23 with the supporting Declaration of James S. Urban, Esq. (Docket No. 44), a Memorandum of Law (Docket No. 45), a Reply Memorandum of Law with Tables A - C (Docket NoI 63), and the Declaration of James S. Urban, Esq. with Exhibits 24 - 32 (Docket No. 64). Plaintiff filed the Affidavit of Anne M. Byrne (Docket No. 56), the Affidavit of Josephine A. Greco, Esq. (Docket No. 57), an opposing Memorandum of Law (Docket No. 58), and a Local Rule 56.1 Counterstatement with appended Exhibits A - BBB (Docket No. 59).

[2]  No reference to the corresponding paragraphs in Plaintiff's Counterstatement is provided where there is no dispute as to the facts stated herein.

[3]  New York Telephone later became known as NYNEX, then Bell Atlantic, then Verizon.  (Byrne Depo. at 27:12-19.)

[4]  All of Byrne's positions with Verizon and its predecessors have been based in Buffalo, New York.

to Sales Engineer I.  (Def's Statement ¶ 21.)

In January 2000, Byrne complained that women were treated unfairly at the Bell Atlantic (later Verizon) Enterprise Solution Group office in Buffalo.  (*Id*. ¶ 41.)  This is the working group in which Byrne was employed from 1996 through 2004.[5]  (*Id.* ¶¶ 3-5, 7-8.)

On June 30, 2000, Bell Atlantic merged with a former competitor, GTE, to form Verizon.  (*Id.* ¶ 22.)  Prior to the merger, GTE marketed and sold voice and data customer premise equipment ("CPE") and certain other equipment that Bell Atlantic did not offer.  (*Id.* ¶¶ 23-25.)  One challenge facing the Verizon (former Bell Atlantic) sales team was their lack of hands-on experience in selling these voice and data CPE products.  (*Id.* ¶ 26.)  Verizon budgeted for two new positions in its Buffalo office titled Senior Specialist-Technology Solutions, to be filled in early 2002, one of which was to focus on voice CPE and the other on data CPE.  (*Id.* ¶¶ 26, 29.)

In February 2001, Byrne received a performance evaluation rating her as "very effective" and, effective March 15, 2001, her base salary increased by 4.3 percent from $57,900.00 to $60,400.00.  (*Id.* ¶¶ 33-34.)  On April 1, 2001, Byrne was promoted to Sales Engineer II and received a 4.9 percent salary increase to $63,400.00.  (*Id.* ¶¶ 35-36.)

In 2001, after the Bell Atlantic/GTE merger but before the Buffalo CPE positions were advertised and filled, Verizon sold a package of services to HSBC bank that included a Nortel PBX, a type of voice CPE system.  (Pl's Appx. Ex. O.)  Byrne worked on that project.  (*Id*.)

Early in 2002, Byrne's supervisor, Sales Engineering Manager Daniel Irving, posted

---

[5]  At some point after 1996, the Systems Marketing Branch appears to have been renamed the Enterprise Solution Group.

the Buffalo office voice and data CPE positions on VZ Jobs, Verizon's internet-based job posting system.  (*Id*. ¶¶ 32, 38 and Pl's Appx. Ex. P.)  Byrne requested that the outside posting be withdrawn and that she be "allowed to step into the position, which would be a lateral move" for her.  (Def's Appx. Ex. 9; Pl's Statement ¶ 39.)  Irving subsequently posted the CPE positions internally as well as externally, and Byrne applied for the  voice CPE job. (Def's Statement ¶¶ 38, 42-45, Pl's Statement ¶ 39.)  The voice CPE position was at least two levels above the Sales Engineer II position Byrne then held.  (Def's Statement ¶ 40.) Byrne was selected as one of six individuals meeting the minimum screening criteria for the position and the slate of candidates was forwarded to Daniel Irving.  (*Id*. ¶¶ 44-45; Pl's Appx. Ex. L at 185.)  All told, there were three external candidates and three internal candidates on the list, with Byrne being the only female.  (*Id*. ¶ 45.)

In March 2002, Irving completed Byrne's 2001 performance assessment, in which he noted that she was the first Sales Engineer in the branch to assist in a PBX sale and described her as "an integral part of the success of the design and installation of that new system."  (Def's Statement ¶ 68; Pl's Appx. Ex. O.)  He further noted that Byrne "took ownership of creating a design, obtaining pricing and meeting difficult customer timelines for a product/service that she had very little exposure to." (Pl's Appx. Ex. O.)  Byrne received a 4.73 percent salary increase on March 31, 2002, to $66,400.00.  (Def's Statement ¶ 69.)

In or around that same time, Irving offered the voice CPE position to David Winley, one of the candidates on the list he had received.  (Def's Statement ¶¶ 44-45, 59.)  The data CPE position, for which Byrne did not apply, was offered to a candidate named Kevin Dean.  (*Id*. ¶ 61.)

4

Beginning on July 26, 2002, Byrne complained about being bypassed for the voice CPE position.  (Pl's Appx. Exs. S-Y, XX.)

Sometime during the summer of 2002, Byrne requested that she be assessed as a Sales Engineer III, but was told in a slide presentation at a branch meeting, and also by a manager, that there was a freeze on assessments.  (Pl's Statement ¶ 87.)  Byrne later learned that two male Sales Engineers in the Albany office had been assessed and promoted during the freeze.  (*Id*.; Def's Statement ¶ 88.)

In early 2003, Daniel Irving was moved to the position of Enterprise Advanced Specialist and Christopher Gaglione, to whom Byrne had reported in 2000, again became her manager.  (Def's Statement ¶¶ 32, 89.)  Also in early 2003, Verizon changed the Senior Specialist title to Sales Engineer IV, and David Winley and Kevin Dean experienced that change in job title.  (*Id.* ¶ 90.)

In March 2003, Daniel Irving, who had been Byrne's supervisor in 2002, evaluated her performance and gave her a rating of "meets expectations."  (*Id.* ¶ 96; Def's Appx. Ex. 16.)  Byrne received an annual discretionary salary increase of 3.77 percent, to $68,900, which she believed was below average based on what she had received in prior years.  (Def's Statement ¶¶ 98-99.)

Byrne complained about certain of the comments in her 2002 appraisal, first to her manager, Christopher Gaglione, and then to Antoinette McDermott of Verizon's EEO office, describing the comments as retaliatory.  (Pl's Appx. Exs. DD-NN, VV.)  McDermott requested that Irving give a written explanation for the specific comments Byrne objected to and afforded Byrne the opportunity to provide a written response.  (*Id.* Exs.  MM, NN,

VV.)  Patrick Koseski, Verizon's Human Resources Manager, assured Byrne that a "meets expectations" rating would not negatively impact her opportunity for an upgrade from Sales Engineer II to Sales Engineer III.  (Def's Appx. Ex. 18.)

On August 17, 2003, Byrne was promoted to Sales Engineer III, along with two other women, and received a pay increase of $6,900 to $75,800.  (Def's Statement ¶ 107; Pl's Appx. Ex. OO.)

In November 2003, David Winley resigned his Sales Engineer IV position and the position was eliminated.  (Def's Statement ¶¶ 108-109.)  In November 2003, Christopher Gaglione posted a job opening in Syracuse for a Sales Engineer IV to focus on the broadband product segment.  (Def's Statement ¶ 110.)  A requirement for the job was that the successful candidate report to, and work out of, the Syracuse office.  (*Id.* ¶ 111; Docket No. 56 ("Byrne Aff.") ¶ 96.)  Byrne applied for the job and was interviewed.  (Def's Statement ¶ 112.)  However, while she was willing to engage in "some travel back and forth to Syracuse [from Buffalo]," she declined to relocate to Syracuse for the position and was not considered further.  (*Id.*; Byrne Aff. ¶ 96; Pl's Statement ¶ 123.)  The individual eventually hired for the position reported to and worked out of the Syracuse office.  (Def's Statement ¶ 115.)

In March 2004, Christopher Gaglione met with Byrne and told her he had assessed her as having met expectations during 2003.  (*Id.* ¶ 119.)  Byrne complained that she believed she should have received a "very effective" rating, to which Gaglione responded that "'met expectations' was a good rating."  (*Id.*)  Byrne received a 3.56 percent salary increase to $78,300.  (*Id.* ¶ 120.)

In May 2004, Kevin Dean, the remaining Sales Engineer IV in Buffalo, resigned and his position was eliminated.  (*Id*. ¶ 122.)  In December 2004, Branch Sales Engineer Manager, Robert Dixon, and Sales Engineer Manager, Christopher Gaglione, advised the three Sales Engineers and one Project Manager still working in the Buffalo office that their positions would be moved to Syracuse in a restructuring.  (*Id.* 130; Pl's Statement ¶ 123.)  Their manager, Gaglione, worked out of the Syracuse office.  (Def's Statement ¶ 125.)  The Buffalo employees were given the options to relocate to Syracuse, transfer to another job in Verizon's Buffalo office, or accept a severance package.  (*Id*. ¶ 130.)

Byrne and the Project Manager each transferred to a different job at Verizon.  (*Id*. ¶¶ 131-32.)  The two remaining Sales Engineers transferred to Syracuse.  (*Id.* ¶¶ 133-34.)  Byrne remains employed in Buffalo at Verizon's outside plant engineering department at a salary in excess of $80,000.  (*Id*. ¶ 131.)

## B.    Procedural History

Byrne filed her administrative charge with the Equal Employment Opportunity Commission ("EEOC") on July 17, 2003 and the EEOC sent notice of the charge to Verizon on July 23, 2003.  (Def's Statement ¶¶ 105-106; Def's Appx. Ex. 19.)  Therein, Byrne alleged that, since April 1996, she had been subjected to different terms and conditions of employment and a hostile work environment because of her sex (Docket No. 16, Ex. B).  Specifically, Byrne alleged that she was denied a promotion in November 2002 and given a negative performance evaluation in March 2003 (*Id*.).  According to the charge, Byrne was retaliated against after she made complaints to Verizon management, its human resources department and one of its EEO advocates (*Id*.).

The EEOC investigated Byrne's allegations and issued a Determination, which also served as the notice of suit rights, dated November 4, 2003 (Docket No. 12, Ex. A). Therein, the EEOC noted that all of Byrne's allegations, except with regard to the disputed performance review, were untimely (*Id.*).

Byrne instituted this action on February 2, 2004, by filing a Complaint in the United States District Court for the Western District of New York.  (Docket No. 1.)  Verizon moved to dismiss the Complaint, except with regard to Byrne's claim of retaliation based on her receipt of a negative performance evaluation and below average raise in 2003.  (Docket Nos. 3, 4.)  Byrne responded by filing an Amended Complaint.  (Docket No. 12.)  Verizon then moved to dismiss the Amended Complaint on the ground that Byrne's amendment has not cured the deficiencies set forth in its original Motion to Dismiss (Docket Nos. 18-20).

Verizon's Motion was granted in part and denied in part pursuant to this Court's Decision and Order dated February 25, 2005.  (Docket No. 21.)  Specifically, this Court dismissed Byrne's Title VII claims of disparate treatment and hostile work environment in their entirety as untimely or not reasonably related to her EEOC charge, and dismissed her Title VII retaliation claim to the extent it is based on conduct occurring prior to her March 2003 performance review.  Thus, the only Title VII allegations remaining relate to purported retaliation occurring in March 2003 and thereafter.

Verizon's motion was denied as to Byrne's claims under the HRL (disparate treatment, hostile work environment and retaliation) and the Equal Pay Act, to the extent that those claims are based on conduct occurring on and after February 2, 2001.

Verizon has now moved for summary judgment dismissing each of the remaining

claims.

## III.  DISCUSSION AND ANALYSIS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.  "An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment." Powell v. National Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted).  In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party. Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000).

The Second Circuit has noted that trial courts should be particularly cautious in deciding whether to grant summary judgment in employment discrimination cases, because the employer's intent is often at issue. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).  However, the Supreme Court more recently has "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L.

Ed. 2d 105 (2000) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 524, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).  In other words, summary judgment can be appropriate even in the fact-intensive context of discrimination cases.  This is consistent with a principle purpose of the summary judgment rule; "to isolate and dispose of factually unsupported claims."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## B.      Disparate Treatment and Retaliation

Byrne contends that she was discriminated against in her employment in Verizon's Enterprise Solutions Group because of her sex and that after she made various complaints, she was subjected to treatment that constituted further acts of discrimination and retaliation.   Verizon seeks summary judgment as to each alleged incident of discrimination and/or retaliation.

Under N.Y. EXEC. LAW § 296(1)(a), it is unlawful for an employer to discriminate against an individual in compensation or in terms, conditions or privileges of employment because of that individual's sex.  In evaluating claims of sex discrimination, this Court applies the burden shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and <u>Texas Dep't of Comt'y Affairs v. Burdine</u>, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).[6]  To make out a *prima facie* case of discrimination, Byrne must show that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an

---

[6]  When considering claims brought under the HRL, this Court employs the same analysis it uses for Title VII claims.  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

10

inference of discrimination.  Weinstock, 224 F.3d at 42 (citing McDonnell Douglas, 411 U.S. at 802).  The burden Byrne carries at the *prima facie* stage of summary judgment is minimal.  Fisher v. Vassar College, 114 F.3d 1332, 1340 n.7 (2d Cir. 1997) (*en banc*), *cert. denied*, 522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998).  In fact, no evidence of discrimination is required.  James v. New York Racing Ass'n, 233 F.3d 149, 153 (2d Cir. 2000).

If Byrne meets her initial burden to establish a *prima facie* case, a rebuttable presumption of discrimination arises and the burden then shifts to Verizon to articulate a legitimate, non-discriminatory reason for the challenged employment action.  Burdine, 450 U.S. at 254.  If Verizon succeeds in making its showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

The burden then shifts back to Byrne to produce "evidence that [Verizon's] proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42.  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Id.*  However, "evidence contradicting the employer's given reason—without more—does not necessarily give logical support to an inference of discrimination."  James, 233 F.3d at 154.  Put simply, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  *Id*. at 156 (quoting St. Mary's, 509 U.S. at 519).

11

It is also unlawful, under both Title VII and the HRL, to discriminate against an employee because that individual has opposed any practice forbidden under those statutes or filed an administrative complaint thereunder.  42 U.S.C. § 2000e-3(a); N.Y. Exec. Law § 296(1)(e).  The allocation of burdens of proof in retaliation claims parallels that of discrimination claims.  Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citations omitted).  However, the elements of a *prima facie* case differ somewhat.  To prevail on her retaliation claims, Byrne must show that (1) she was engaged in a protected activity, (2) Verizon was aware of her participation in this activity, (3) Verizon took an action against her that was so materially adverse a reasonable employee would have been dissuaded from engaging in protected activity, and (4) there is a causal connection between the protected activity and the adverse action—that is, a retaliatory motive played a part in the action.  Burlington N. & Santa Fe Ry. v. White, ___ U.S. ___, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

### 1.      Failure to Promote / Delay in Promoting

### (a)     Senior Specialist-Technology Solutions (Voice CPE) Position

Byrne claims that she was discriminated against when Verizon decided to hire a less qualified male, David Winley, for this position in 2002.  Byrne does not contend that this action was retaliatory.

Verizon first argues that Byrne cannot establish a *prima facie* case of discrimination because she cannot demonstrate she was qualified for the voice CPE position.  Verizon further urges that, even assuming a *prima facie* case exists, Byrne cannot show pretext because all individuals hired for CPE positions had hands-on experience working for

12

manufacturers or resellers of such products; experience Byrne did not possess.

To demonstrate a *prima facie* case of failure to promote, a plaintiff must show that (1) she is a member of a protected class, (2) she applied and was qualified for a job for which the employer was seeking applicants, (3) she was rejected for the position, and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.  Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998) (quoting McDonnell Douglas, 411 U.S. at 802)).  In this Court's view, Byrne has sufficiently shown the existence of a *prima facie* case.

The only *prima facie* factor Verizon questions is whether Byrne met the qualifications for the voice CPE position.  However, Verizon relies not on the criteria set forth in the job posting, but on "super-criteria" known only to Verizon management.  While Verizon may advance this "super-criteria," relating to Verizon's "strategic decision to recruit and hire individuals who had experience working for either manufacturers of voice and data CPEs or resellers of these products" (Def's Statement ¶ 27), as its legitimate, non-discriminatory reason for the ultimate hiring decision, it has nothing to do with Byrne's ability to show that she met the criteria specified in Verizon's posting and made known to the applicants.  *See* Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 127 (2d Cir. 2004) ("being 'qualified' refers to the criteria the employer has specified for the position") (quoting Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 29 (2d Cir. 1997)).

Among the "highly desired skills" in the posting are "[e]xperience in value selling of customer premise equipment for voice switching, designing and selling Nortel Enterprise

Voice Switching products . . . [and] [b]ackground in the engineering of PBX voice switching and networking." (Pl's Appx. Ex. P.) Verizon does not contend that Byrne did not meet the published criteria.  Indeed, Byrne's contemporaneous performance appraisal credited her with assisting the sales organization, being an integral part of securing new revenues, her work on the sale of one Nortel PBX system, her willingness to embrace Verizon's newest technological offerings, her ability to investigate and design of customer solutions, her assistance in solving customer concerns involving repair and implementation issues, and her creation of a design for the office's first PBX sale.  (*Id*. Ex. O.)  Moreover, Verizon concedes that Byrne met the screening criteria employed by Verizon's staffing department in connection with this position and was placed on the slate of candidates forwarded to the hiring supervisor.  (Def's Statement ¶ 44).  In light of Byrne's *de minimus* burden at this stage, the evidence she offers is more than sufficient to establish a *prima facie* case.

As noted above, Verizon contends that it had additional criteria for filling this position and that its hiring decisions were consistent with that criteria.  There is no dispute that Verizon did not offer voice CPE equipment prior to the Atlantic Bell/GTE merger in mid-2000 and that the Verizon (former Bell Atlantic) sales team lacked hands-on experience with these products.  Verizon attests that it wanted to send the message to customers that even though these products were new to its sales team, it was investing in personnel who had hands-on experience with them.  (Def's Appx. Ex. 4 ¶ 16; Ex. 8 at 91:9-19.)  Verizon was "looking for people who came in with a name, with a heritage in the CPE world [from the likes of a Nortel, Sysco, and so forth], that could help us make a splash in each of the markets."  (*Id*. Ex. 8 at 120:16-20; *also* 312:17-313:3.)  Though this strategy and criteria

are not explicitly stated in the job posting, Verizon's desire to bring in new individuals for the voice and data CPE positions is reflected in the fact that the job in dispute initially was posted externally only.  Furthermore, of the eight Senior Specialist Technology Solutions positions created within the ESG Branch in which Byrne worked, seven were filled by individuals who previously had worked for a manufacturer or reseller of voice and data CPE products.  (Def's Statement ¶ 64; Def's Appx. Ex. 4 ¶ 20.) The eighth had been a PBX telecommunications manager and head of a Nortel Networks user group.  (*Id.*)

The individual who was hired for the Buffalo voice CPE position, David Winley, came from Nortel Networks (a manufacturer) where he worked for eighteen months as a Systems Engineer providing technical designs, including analysis, configuration and pricing.  (Pl's Appx. Ex. R.)  Prior to that, Winley worked for GTE (a reseller) where he spent thirteen years determining the requirements for, installing, modifying and improving phone services at U.S. Embassies throughout the world.  (*Id.*)  In Daniel Irving's comments relative to his selection of Winley, he emphasized Winley's work at Nortel, his fifteen years of technical experience in installation, design and engineering, and his work as a technical trainer.  (Def's Appx. Ex. 11.)  Irving characterized Byrne as "a strong candidate [who] is missing hands on experience with system installation and equipment design that the Sr. Specialist position requires."  (*Id*. Ex. 12.)  In this Court's view, Verizon has articulated a legitimate non-discriminatory reason for its decision to hire Winley.

Byrne responds by arguing that Winley was not qualified for the voice CPE position. She does not address Verizon's stated business reasons for its decision directly, but urges that the fact she "was not even interviewed, taken with the dearth of qualifications of David Winley" raises serious questions as to the need to bring an outside person in to fill this

15

position.  (Docket No. 58 ("Pl's MOL") at 21.)

First, Byrne does not contend that she was the only person on the slate of six candidates who was not interviewed.  Furthermore, like Byrne, three males who had been classified as qualified by the staffing department were subsequently deemed "not qualified" by the hiring supervisor, Daniel Irving.  (Pl's Appx. Ex. R.)

Although Byrne claims that Winley was not qualified for the voice CPE position because he lacked a college degree, it is clear from the record that a college degree was not a job requirement. (Pl's Appx. Ex. P (seeking Bachelor's degree or equivalent experience).)  Byrne does not suggest that Winley lacked "equivalent experience." Similarly, though Byrne criticizes the weight accorded to Winley's experience by suggesting that "much of his prior experience was as an installer and not in design" (Pl's MOL at 3), the record indicates that technical knowledge of these products was one of the "proven skills" required for the position.  (Def's Appx. Exs. 10, 11.)  Byrne does not identify any qualification that Winley did not possess, at least on paper.  (Pl's Appx. Ex. R).

Finally, this Court is not persuaded that problems with Winley's subsequent performance evidences a discriminatory intent at the time of his hire.  How one presents and how one performs are very often two different questions.  Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986) ("The employer need not prove that . . . it made the wisest choice, but only that the reasons for the decision were nondiscriminatory").

In sum, this Court finds that Byrne does not point to evidence sufficient to create a genuine factual question as to whether Verizon's stated business reasons for its hiring decision were a pretext for discrimination.  Accordingly, summary judgment is warranted on Byrne's claim of failure to promote relative to the Senior Specialist-Technology

Solutions (voice CPE) position.

        **(b)**      **Delayed Promotion from Sales Engineer II to Sales Engineer III**

Byrne alleges that she sought to be promoted to Sales Engineer III sometime during the summer of 2002 and that the approximately one-year delay in her receipt of the promotion, in August 2003, was both discriminatory and retaliatory.  According to Byrne, she was told in a meeting and by her supervisor that all such promotions were frozen for 2002.  However, she later found that two males had been promoted during the purported freeze.

Verizon first urges that a delayed promotion is not an adverse employment action and, therefore, Byrne cannot demonstrate a *prima facie* case.  This does not appear to be a frequently discussed or settled question either within or beyond this Circuit.  *See* Samuels v. New York State Dep't of Corr. Svcs., 94 Civ. 8645, 1997 U.S. Dist. LEXIS 6739, at *17-19 (S.D.N.Y. May 14, 1997) (assuming, without discussion, that alleged race-based delay in granting promotions was adverse employment action, but granting summary judgment to defendant where two of four promotions plaintiff complained of were given to persons of plaintiff's race); Shabat v. Blue Cross Blue Shield of the Rochester Area, 925 F. Supp. 977, 987 (W.D.N.Y. 1996), *aff'd*, 108 F.3d 1370 (2d Cir. 1997) (holding that plaintiff's dissatisfaction with the pace of his career progress and belief that he should have been promoted sooner is not enough to make out a prima facie case under Title VII); Jacob-Mua v. Veneman, 289 F.3d 517, 522 (8th Cir. 2002) (finding that denial of timely promotion was not adverse employment action); Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001) (delayed promotion is not adverse employment action *if*

employer awards backpay when promotion is finally received [emphasis added]); Singh v. U.S. Security Assoc., Inc., 03 Civ. 2059, 2005 U.S. Dist. LEXIS 1407, at *25-26 (S.D.N.Y. Jan. 31, 2005) (declining to read Jacob-Mau broadly, noting that finding of no adverse employment action appeared to turn on specific facts of that case); McGinnis v. United States Air Force, 266 F. Supp. 2d 748, 771-72 (S.D. Ohio 2003) (defendant's motion for summary judgment denied where plaintiff asserted she had lost opportunities for advancement because of delayed promotion); Pyles v. Boeing Co., No. 00-2394, 2002 U.S. Dist. LEXIS 24787, at *36-39 (D. Kan. Dec. 19, 2002) (delayed promotion and attendant differential pay treatment raised sufficient inference of discrimination to defeat summary judgment).

The majority of courts that have engaged in analysis on this issue appear to consider the relevant inquiry to be whether the alleged delay in promotion carried with it any identifiable adverse consequences. This Court agrees with that approach. Here, Byrne generally asserts differential treatment in compensation and it appears on this record that, at the very least, she would have received her $6,900 promotional pay increase approximately one year earlier had Verizon assessed her when she first made her request.

Verizon does not dispute that Byrne requested assessment sometime in 2002, nor does it contend that she was not eligible or qualified to assess as a Sales Engineer III at that time. Furthermore, Verizon does not dispute that two males received Sales Engineer promotions in 2002. Accordingly, this Court finds that Byrne has demonstrated a *prima facie* case of sex discrimination.

In its memorandum, Verizon suggests, without actually stating, that the promotion of two males in 2002 related to their product specialty—data CPE. Its testimony in this

18

regard is equivocal.  Mark Van Hoesen, Branch Vice President, testified that he thought "that there were a couple of individuals who were assessed—that assessed into a data competency.  I'm not positive of that."  (Def's Appx. Ex. 8 at 193:21-194:1.)  While it may be true that the persons promoted worked in a data capacity, Verizon has not come forward with any competent evidence that there was a defined need to promote individuals in a particular product area in 2002 despite the branch-wide freeze, or that any specific decision was made to lift the promotion freeze based on that criteria.  In fact, though not raised in Byrne's opposing papers, this explanation is facially at odds with Verizon's statement that existing employees lacked experience in voice and data CPE in 2002, thereby necessitating outside hires in these areas.  In short, the rather cryptic testimony offered by Verizon just as readily suggests that promotions were frozen in 2002 except when it came to male candidates.

Because Verizon has not articulated a legitimate, non-discriminatory reason for its 2002 promotional decisions, its motion for summary judgment on Byrne's discrimination claim of delayed promotion is denied.

Neither party has drawn a distinction between discrimination and retaliation claims with regard to what constitutes an adverse action for purposes of the *prima facie* case. The Supreme Court's recent decision in <u>Burlington N. & Santa Fe Ry. v. White</u>, ___ U.S. ___, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) informs the retaliation side of that inquiry. In <u>Burlington N. & Santa Fe Ry.</u>, the Supreme Court expressly considered how harmful an act of retaliatory discrimination must be in order to fall within Title VII's scope, and concluded that  an action is "materially adverse" if "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  126 S. Ct. at

2415 (citations and internal quotation marks omitted).  Applying the standard to the facts of that case, the Supreme Court held that a jury could reasonably conclude the plaintiff's reassignment to more arduous and dirtier duties within her job description, and her 37-day suspension without pay for which she ultimately received backpay, were materially adverse.  Both a switch to less prestigious duties and the hardship of a month without a paycheck could reasonably be found to be materially adverse to a reasonable employee. *Id*. at 2416-18.  This standard is broader than the "adverse employment action" analysis applied to discrimination claims and, when applied in this case, it is reasonable to conclude that concern that a promotion for which one is qualified might be delayed for a year could dissuade a reasonable worker from engaging in protected activity.

Nevertheless, Byrne has not succeeded in demonstrating a *prima facie* claim for retaliation because she has not attempted to causally link the delayed promotion to any protected activity.  A plaintiff may establish a causal link between protected activity and an allegedly adverse employment action either "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed" against her.  Smith v. Ward Leonard Elec. Co., Inc., 00 Civ. 3703, 2004 U.S. Dist. LEXIS 14151, at *21-22 (S.D.N.Y. Jul. 22, 2004) (quoting Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991)).

If a plaintiff relies on temporal proximity alone, the temporal relationship between the protected activity and the adverse action must be very close.  Parrish v. Sollecito, 258 F. Supp. 2d 264, 268 (S.D.N.Y. 2003) (citing Clark County Schl. Dist. v. Breeden, 532 U.S. 268, 273074, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)).

Though Byrne alleges in her Amended Complaint that she requested she be assessed "[i]n or about Summer 2002" (Am. Compl. ¶ 76), she has not provided any testimony or evidence that would place her request, the meeting at which she was told promotions were frozen, or the promotion of male coworkers in a close temporal relationship to protected activity.  Nowhere does Byrne state that any of these events took place after she made internal complaints in late July 2002 about being bypassed for the voice CPE position.  The only other possible predecessor complaint occurred in January 2000, which simply is too attenuated to support a causal connection.  *See* Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 555 n.5 (2d Cir. 2001) (citing numerous cases suggesting that any period over one year is too attenuated to draw a causal connection).[7]

For the reasons stated, Verizon's motion for summary judgment is denied with respect to the discriminatory delay in promotion claim, but granted with respect to the retaliatory delay in promotion claim.

### (c)    Elimination of David Winley's Position

It is undisputed that after David Winley resigned in November 2003, his position was not filled and a Sales Engineer II position was created in its place.  However, Byrne attests that Verizon did post Winley's Sales Engineer IV position and that after she applied for the position, she found out that the posting had been cancelled.  (Byrne Aff. ¶ 85.)  It is unclear

---

[7]  A number of district court decisions issued after Gorman-Bakos have further narrowed that timeframe.  Woods v. Enlarged Sch. Dist. of Newburgh, 04 Civ. 9106, 2007 U.S. Dist. LEXIS 8665, at * 83 (S.D.N.Y. Feb. 7, 2007) (five month gap between complaint of race discrimination and termination, absent other evidence of retaliatory motive, precludes finding of causal connection); Cunningham v. Consol. Edison, Inc., CV-03-3522, 2006 U.S. Dist. LEXIS 22482, at *55 (E.D.N.Y. (Mar. 28, 2006) ("a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.").

from Byrne's phrasing whether the posting was, in fact, cancelled after she applied or whether she simply did not find out it had been cancelled until afterward.  Nevertheless, even assuming the former,[8] Byrne's claims of discrimination and retaliation in connection with Verizon's decisions relative to this position fail at this summary judgment stage.

Byrne contends that the withdrawal of the posting was both an act of discrimination and  in retaliation for her filing an EEOC charge four months prior, on July 17, 2003.  There is no dispute that Byrne filed a charge and that Verizon knew of her protected activity.

As Verizon notes, Byrne's EEOC filing was most closely followed, on August 17, 2003, by her promotion from Sales Engineer II to Sales Engineer III and a related pay increase of $6,900.[9]  (Def's Statement ¶ 107; Pl's Appx. Ex. OO.)  This fact alone is sufficient to break the causal link in Byrne's claim that Verizon retaliatorily sought to deny her promotional opportunities.  Smith, 2004 U.S. Dist. LEXIS 14151, at 22-23 (where plaintiff received assignments entitling him to overtime pay after he filed a discrimination charge, his claim that he was denied such opportunities at some later date did not evidence a causal connection to his protected activity); *see also*, Manatt v. Bank of America, NA, 339 F.3d 792, 800-802 (9th Cir. 2003) (reasonable jury could not infer that adverse employment action was caused by retaliatory motive where employee was given

---

[8]  Verizon's assertion that the withdrawal of the posting is gender neutral because no one, male or female, could thereafter pursue the position misses the thrust of Byrne's allegation; that the withdrawal of the posting was in direct response to her application.

[9]  On July 8, 2003, Branch Sales Engineer Manager, Christopher M. Sacco, recommended Byrne for promotion to Sales Engineer III and sought input from her managers with the intent to schedule an assessment board on July 22, 2003.  Byrne filed her charge nine days after that recommendation, on July 17, 2003.  The record does not include any information from which this Court can discern when Byrne was actually assessed.  However, there is no dispute that she received the promotion for which she had been recommended one month after filing her charge, and three weeks or less after Verizon received notice of the filing.

a pay raise and selected for prestigious assignment between time she filed complaint and employer's decision not to grant transfer request); Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997) (reversing jury verdict in favor of retaliation plaintiff because supervisors' positive evaluation and two promotion recommendations occurring after she made protected statements and before her termination "were utterly inconsistent with an inference of retaliation").

Though not mentioned by Verizon, this Court also notes that in the same month the Buffalo Sales Engineer IV (voice CPE) job was posted and withdrawn, a Sales Engineer IV position (broadband) was posted in Syracuse by the same supervisor, Christopher Gaglione.  Byrne applied for that position as well, and that posting was not withdrawn after she submitted her application.  In fact, Byrne was interviewed for the position.  (Pl's Aff. ¶ 86.)

In the course of discovery in this case, Byrne elicited from Verizon a statement of its reason for withdrawing the Buffalo Sales Engineer IV posting and replacing it with a Sales Engineer II position.  Christopher Gaglione testified that he put the initial posting out so that the position would not be cancelled on him.  (Docket No. 64 ("Urban Decl."), Ex. 31 at 180:8-13.)  Gaglione further stated that he subsequently withdrew that posting and posted a Sales Engineer II position instead after management agreed with his "assertion that we could get an SE4 quality person from the outside for SE2 pay because of the state of the marketplace and the fact that there were more qualified and talented people available at that lower pay grade and I knew firsthand about at least a couple of them."  (Id. at 179:20-180:4.)

Byrne has not attempted to counter Verizon's stated business reason that the voice

23

CPE marketplace had turned in Verizon's favor. She merely asserts, in conclusory fashion, that "the totality of [Verizon's conduct] raises questions of fact precluding summary judgment." (Pl's MOL at 28.)

Were this Court to consider only the temporal relationship between Byrne's charge and the withdrawal of the job posting, that might be sufficient to raise a question of fact. Gorman-Bakos, 252 F.3d at 554 (noting that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." and finding a lapse of four months insufficient to defeat the plaintiff's claim for retaliation). However, as Byrne correctly notes, this Court must look to the totality of circumstances existing in this case. Byrne has not come forward with any evidence suggesting that Verizon's stated reason for withdrawing the posting is pretextual, or that it was motivated to do so because Byrne filed an EEOC charge, particularly where she had been promoted in the interim and Verizon did not withdraw another posting for which she contemporaneously applied.

This Court finds that under the totality of these circumstances, no reasonable jury could infer a discriminatory or retaliatory intent relative to the decision to repost the Winley position as a Sales Engineer II. Therefore, summary judgment is warranted under both discrimination and retaliation theories.

### (d)    Syracuse-Based Sales Engineer IV Position

Byrne alleges that Verizon's decision not to hire her for the Syracuse Sales Engineer IV position in December 2003 was both discriminatory and retaliatory.

Byrne has not demonstrated a *prima facie* case of discrimination because she concedes that she did not meet the qualifications for the position. Specifically, the position required that the successful candidate be based in Syracuse and  Byrne attests that after interviewing for the position, she "advised Christopher Gaglione that I did not intend to move to Syracuse." (Pl's Aff. ¶ 87.) <u>Briody v. American Gen. Fin., Co.</u>, Civ. No. 98-2728, 1999 U.S. Dist. LEXIS 8405, at *18-19 (E.D. Pa. May 27, 1999) (employer entitled to summary judgment where there was no dispute that position required relocation and plaintiff did not fulfill requirement).

Even had she demonstrated a *prima facie* case, Byrne has offered no evidence that would suggest Verizon's stated reason for not considering her further—her unwillingness to relocate—was pretextual under either a discrimination or retaliation theory.  The only argument Byrne advances is her nebulous assertion that "[o]ther SE IV's worked out of that office without actually living in Syracuse." (*Id*. ¶ 96.)  Byrne has made no attempt to identify any such individual, much less obtain any confirming statement in this regard.  Her vague statement is insufficient to raise a question of fact, particularly where she concedes that the individual who was hired for the posted broadband position did report to and work out of the Syracuse office. (Pl's Statement ¶ 115.)

Moreover, Byrne's own exhibits support the conclusion that Verizon did not single her out in this regard.  Verizon previously had determined that Barry Prichette, a male

candidate for the 2002 Buffalo Sales Engineer IV (voice CPE) position, was "no longer a viable candidate" after he stated he was "interested in working in Syracuse Area only . . . [and did] not wish to relocate to Buffalo." (Pl's Appx. Ex. Q.)  In short, a male applicant was treated exactly as Byrne was upon stating his unwillingness to locate to the specified office. *Compare* Hernandez v. Data Systems, Int'l, Inc., 266 F. Supp. 2d 1285, 1302-1303 (D. Kan. 2003) (plaintiff sufficiently challenged residency requirement as pretextual where he was never asked to relocate, never stated he was unwilling to relocate and identified similarly situated employees for whom residency requirement was not enforced).

Under the circumstances here, there is no genuine issue of material fact as to Verizon's reason for hiring someone other than Byrne for this position.   Byrne acknowledges that she refused to relocate and has not identified any similarly-situated individual who was treated differently.   No reasonable jury could find that Verizon's decision not to consider her further was a pretext for either sex discrimination or retaliation.

### 2.      Retaliatory Job Assignments and Performance Evaluation

Byrne contends that almost immediately after she made an internal complaint, in July 2002, about not getting the voice CPE position, Daniel Irving's manner toward her changed.  In particular, Byrne alleges that Irving: 1) changed her product specialties, 2) assigned her menial duties that traditionally had been performed by administrative employees, 3) assigned her to Cindy Moll's accounts while Moll was on disability leave, 4) requested that she work over a weekend while her mother was in the hospital, and 5) in March 2003, gave her a "meets expectations" performance assessment, which was lower than her previous evaluation.

As noted above, the Supreme Court recently clarified the third prong of a *prima facie* retaliation case as follows:  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   Burlington N. & Santa Fe Ry., 126 S. Ct. at 2409 (internal citations omitted).[10]   The Supreme Court cautioned, nevertheless, that courts must "separate significant from trivial harms."   *Id*. at 2415.   Engaging in statutorily protected activity does not mean the employee is "immunize[d] . . . from those petty slights or minor annoyances that often take place at work and that all employees experience."   Rochan v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks omitted).   Thus, "context matters . . . [and] 'an act that would be immaterial in some situations is material in others.'" Burlington N. & Santa Fe Ry., 126 S. Ct. at 2415-16 (quoting Washington v. Ill. Dep't of Rev., 420 F.3d 658, 661 (7th Cir. 2005)).

Verizon contends that the challenged actions are trivial harms that do not reach the contemplated level of "material adversity."   Viewing the facts and circumstances in their totality, this Court agrees.

According to Plaintiff, in addition to voice CPE, Irving assigned her to long distance, data, video conferencing and broadband services over an unspecified period of time. (Byrne Aff. ¶ 45; Byrne Depo. at 169:16-170:2.)   In her deposition, Byrne acknowledged that her product specialties also were "occasionally changed" under her previous

---

[10]   Burlington N. & Santa Fe Ry. was decided after Verizon's Motion for Summary Judgment and Byrne's opposition to same.   Verizon acknowledged the decision's applicability to this case in its reply memorandum.

supervisor, Gaglione, and that males were "occasionally" transferred between product specialties, as well.  (Byrne Depo. at 170:6-18.)  Her former coworker, Thomas Spencer, stated that under Irving and Gaglione his product specialties were changed at least annually, if not more often.  (*Id.* Ex. 29 ¶ 8.)

Assuming Byrne's product specialties were added to more frequently than male colleagues, the adversity she identifies is the time required to learn new things, which she believed diluted her sales efforts in the one area—voice CPE—where she wished to concentrate.  In her opposing memorandum, Byrne equates the addition of product lines to receiving a transfer to a less prestigious position that lessened her opportunity for advancement.  (Pl's MOL at 23-24.)  However, Byrne was promoted to Sales Engineer III within a year of this purportedly adverse action and the knowledge she gained in broadband presumably helped garner her an interview for a Sales Engineer IV position in that specialty in late 2003.

Byrne next contends that she was required to run minor maintenance quotes for PBX, which were time consuming and did not require the experience of a sales engineer. (Pl's Aff. ¶ 46.)  At her deposition, she clarified that lower level employees called CBSs did those quotes in the Syracuse office, but "Dan didn't seem to be able to get our CBSs [in Buffalo] for whatever reason . . . to do them."  (Byrne Depo. at 177:16-178:3.)  Byrne also testified that Kevin Dean "ran a lot of his own quotes" and that she did not have any basis to believe she was being singled out in this regard.  (*Id.* at 179:21-180:14.) In August 2002, one of Byrne's coworkers, Cindy Moll, went out on a disability leave that was expected to last for three weeks and Irving assigned Byrne her responsibilities until her return.  (Pl's Aff. ¶ 48.)  According to Byrne, Thomas Spencer was listed as the secondary Sales Engineer

28

on many of Moll's accounts and Byrne should not have been assigned all of the work.  (*Id.* ¶ 49.)  There is no dispute that Byrne immediately complained to Irving and two of his supervisors, and that all responsibilities were reassigned to Thomas Spencer for the term of Moll's disability.  (Def's Statement ¶¶ 75-77; Pl's Statement ¶¶ 75-77; Pl's Appx. Ex. AA.)

In October 2002, Irving asked Byrne to help complete a response to a request for proposal by working over a weekend.  Byrne stated that she preferred not to because her mother was terminally ill, but he didn't have anyone else to work on it so she took a laptop home with her.  (Byrne Depo. at 185:18-23.)  Byrne's mother passed away that weekend, so she did not complete the project.  (*Id.* at 185:22-186:3.)  Byrne does not contend that any action was taken against her for failing to complete the work.

Verizon's performance assessments allow for six ratings: E (exceeds expectations), VE (very effective), M (meets expectations), IN (improvement needed), DN (does not meet position requirements) and NR (not rated).  (Pl's Appx. Ex. CC.).  According to Byrne, Irving retaliatorily gave her a "meets expectations" rating for 2002 (received in March 2003) when she should have received a "very effective."  (Pl's Aff. ¶ 66.)  Byrne characterizes the review as "negative" and her $2,500 pay increase as "slightly below average."  (*Id.*)  She states that she was concerned at the time that the rating would impact her ability to be promoted.  (*Id.*)

Byrne does not offer any basis for her belief that a rating of "meets expectations" constitutes a "negative" evaluation at Verizon.  Nor has she identified any harm suffered as a result of the allegedly unfair evaluation.  After Byrne complained about her evaluation,

she was assured by Verizon's Human Resources Manager that a "meets expectations" rating would not negatively impact her opportunity for an upgrade (Def's Appx. Ex. 18.), and Byrne was promoted approximately five months after receiving her review, on August 17, 2003.

This Court finds that the incidents described by Byrne, in their totality, are simply of insufficient "material adversity" to have "dissuade[d] a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry., 126 S. Ct. at 2409. It clearly did not dissuade Byrne.[11]

### 3.      The 2004 Transfer of Positions to Syracuse

In December 2004, the three Sales Engineers (including Byrne) and one Project Manager working in Verizon's Buffalo office were informed that their positions would be moved to Syracuse in a restructuring.   (Def's Statement ¶ 130; Pl's Statement ¶ 123.) Byrne contends that this decision was made in retaliation for her having commenced this lawsuit some ten months earlier.  In her opposing memorandum, Byrne argues that the "timing of the decision in conjunction with the way it was presented" and the "rationale offered by [Verizon] raises questions of fact as to whether it was a pretext."  (Pl's MOL at 29.)

The first issue this Court will consider is Verizon's articulated reason for the decision.  Verizon states that in the Fall of 2004, Corporate Account Managers in Buffalo and Rochester complained to Branch Sales Engineering Manager, Robert Dixon, that the

---

[11]  To the extent that any of these incidents are alleged to be "further acts of discrimination" as well as acts of retaliation, they also do not rise to the level of adverse employment actions under the more stringent "adverse employment action" standard applicable to discrimination claims.

Buffalo Sales Engineers were difficult to reach and not responsive to requests.   (Def's Appx. Ex. 21 ¶¶ 4, 6.)  Dixon also had received complaints about five Sales Engineers working in Verizon's Providence, Rhode Island office. (*Id*. ¶ 5.)  At that time, neither the Buffalo nor the Rhode Island Sales Engineers had an on-site Sales Engineering Manager. Chris Gaglione, who was based in Syracuse, supervised the Buffalo Sales Engineers (as well as those in Syracuse) and the Rhode Island workers reported to a manager based in Valhalla, New York.  (*Id*. ¶ 6.)

To address the concerns raised, Dixon proposed to his supervisor that an on-site manager be hired to supervise the Providence Sales Engineers, where a sixth position was to be added in 2005, and that the three Buffalo Sales Engineers be moved to Syracuse, where their existing manager was located.  (*Id*. ¶¶ 7-8.)  Dixon considered the hiring of an additional manager for Buffalo, but rejected that option as not justified in light of the small number of Sales Engineers working there.   (*Id*. ¶ 8.)   Dixon's supervisor, Mark Van Hoesen, reviewed and concurred with his proposal.  (*Id*. ¶ 9; Ex. 8 at 64:5-13.)  In this Court's view, Verizon has sufficiently articulated a non-retaliatory business reason for its restructuring decision.

At her deposition, Byrne stated that she and her colleagues were advised the Sales Engineer functions were being moved to Syracuse for business reasons and that she does not know what factors Verizon considered in making that decision. (*Id*. Ex. 1 at 213:20-22, 216:7-14.)  She suggests in response to Verizon's motion, however, that questions of pretext exist because: 1) Robert Dixon, the Branch Sales Engineer Manager who supervised Christopher Gaglione and other Sales Engineer Managers had his office in

Buffalo, and 2) Corporate Account Managers remained in Buffalo. (Pl's MOL at 29.)

Byrne's belief that Verizon had another avenue by which it could have dealt with complaints about unsupervised Sales Engineers is not evidence and is not sufficient to raise an inference of retaliation. Nor has Byrne offered evidence that it would be a departure for Verizon to have Corporate Account Managers working in an office that did not also have Sales Engineers. Indeed, on this record, it appears that Corporate Account Managers in Rochester relied on Sales Engineers in Buffalo and/or Syracuse. Byrne's opinion that Verizon's explanation is deficient, without more, is insufficient to meet her burden at this stage because she has not offered "evidence that [Verizon's] proffered, non-discriminatory reason is a mere pretext for actual [retaliation]." <u>Weinstock</u>, 224 F.3d at 42.

Even had Byrne come forward with direct or circumstantial evidence sufficient to raise such an inference, her argument would fail for other reasons. This action arises from Byrne's EEOC charge, which Verizon had notice of at least seventeen months prior to the restructuring decision. Byrne was promoted one month after filing her EEOC charge, and subsequently was interviewed for a further promotion. It has been discussed above and does not bear repeating that this extended temporal gap, coupled with an intervening promotion and pay raise, precludes the finding of a causal connection.

Finally, Byrne concedes she was not singled out for transfer and has not sought to explain how a restructuring decision that effected several individuals was retaliatory to her.

For all of these reasons, summary judgment is warranted with respect to Byrne's allegation of a retaliatory job transfer.

### 4.        Sexually Hostile Work Environment under the HRL

Byrne contends that she was subjected to "unwelcome comments, insults and other sexually offensive conduct thus creating a hostile work environment." (Am. Compl. ¶ 118.) The post-February 2, 2001 incidents complained of are as follows:

- In February 2002, Byrne overheard a manager from Albany say that Dan Irving had looked at a female coworker and said the word "hooters." (Def's Appx. Ex. 1 at 240:8-241:13.)

- In October 2002, Byrne overheard two male employees, David Jager and Kevin Dean, discussing "The Man Show." Byrne had never seen the show and has no recollection of what the men said, but recalls that "they were laughing about the content of the show and degrading women." (*Id.* at 184:1-23.)

- In December 2002, Daniel Irving attempted to organize a holiday party and included former Regional Sales Manager Michael McGowan among the invitees. Byrne and other employees stated that they would not attend, and the party was cancelled. (*Id.* at 188:8-189:12.)

- In early 2003, Byrne was coming from the office kitchen and heading toward her desk when she overheard Mike Finnegan and David Jager discussing the fact that Jager had just become a father. Finnegan joked with Jager about not being able to have sex with his wife and stated that "any guy that had to go that long without sex would be in an upright and locked position." Byrne told Finnegan to stop his conversation and he did. (*Id.* at 190:5-191:18.)

- Sometime in 2003, a male coworker, Tom Spencer, told Byrne that another male employee had given out his work fax number as "25 penis." (*Id.* at 191:19-193:17.)[12]

---

[12]  In her Affidavit, Byrne also states that at some unspecified time, a female coworker showed her a suggestive note that Daniel Irving had left on the coworker's desk in April or May of 2001 (Byrne Aff. ¶ 23), and at another unspecified time, a different female coworker complained to Byrne about comments David Winley made to that coworker about her appearance and perfume in 2002 (*Id*. ¶ 61). Byrne did not mention these incidents in her extensive Amended Complaint, does not attest to any dates or timeframes for these conversations, and has not produced any confirming statements from her coworkers about the content or timing of their conversations. They may have occurred contemporaneously, or they may have occurred after Byrne commenced this lawsuit. It simply is not clear from Byrne's Affidavit, but this Court will draw all factual inferences in Byrne's favor for purposes of this motion and assume that they occurred contemporaneously.

To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must establish two elements.  First, the plaintiff must show that "her workplace was permeated with 'discriminatory intimidation, ridicule and insult . . . that [wa]s sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'"  Ribis v. Mike Barnard Chevrolet-Cadillac, Inc., 03-CV-6489L, 2007 U.S. Dist. LEXIS 1397, at *28 (W.D.N.Y. Jan. 8, 2007) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal citations and punctuation omitted).  Second, the plaintiff must show the existence of a specific basis for imputing the conduct that created the hostile work environment to her employer.  Ribis, 2007 U.S. Dist. LEXIS 1397, at *28 (citing Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir.), cert. denied, 540 U.S. 1016, 124 S. Ct. 562, 157 L. Ed. 2d 428 (2003); Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002); Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).

To meet the first requirement, Byrne must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted to have altered the conditions of her working environment."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (internal punctuation omitted).  In other words, Byrne must show that she was subjected to hostility because of her gender and hampered in her job because of the conduct.  Pascal v. Storage Tech Corp., 152 F. Supp. 2d 191, 206 (D. Conn. 2001).

In Harris, the Supreme Court set forth a non-exhaustive list of factors relevant to determining whether the alleged conduct was so "severe or pervasive" that it supports a

Title VII claim of discrimination, including: 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance;" 4) whether the conduct unreasonably interfered with the plaintiff's work; and 5) what psychological harm, if any, resulted.  510 U.S. at 23.

Crediting Byrne's additional attestations regarding conversations with her female coworkers, she alleges seven incidents of unwelcome comments, insults or other sexually offensive conduct occurring over the course of at least two years.  Three of the objectionable comments were overheard by her.  The remaining three were relayed to her by other employees sometime after they occurred.[13]

The mere fact that a plaintiff is not present when a derogatory comment is made does not render the comment irrelevant to a hostile work environment claim.  Schwapp, 118 F.3d at 111-12 (twelve incidents in a 20-month period, some of which were on personal knowledge and some of which the plaintiff learned of second hand, sufficient to survive summary judgment).  Indeed, conduct directed at other employees is part of the totality of circumstances to be considered in evaluating a hostile work environment claim.  Perry, 115 F.3d at 149.  Of central importance, however, is evidence of specific hostility directed toward the plaintiff.  Id. (quoting Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987)).  That is what is missing here.

Byrne does not describe any offensive conduct directed toward her and that fact readily distinguishes this case from every case on which she relies.  Kotcher, 957 F.2d 59

---

[13]  The final incident regarding the holiday party apparently falls under the category of sexually offensive conduct.  Byrne's objection to the invitation of a former manager was based on her belief that the manager had discriminated against her years earlier.

35

(touching, gestures and comments directed at plaintiff); Barbetta v. Chem Lawn Services Corp., 669 F. Supp. 569 (W.D.N.Y. 1987) (same); Valentine v. New York, 94 CV 3911, 1997 U.S. Dist. LEXIS 24059 (E.D.N.Y. Sept. 9, 1997) (plaintiff exposed to daily use of sexually explicit language); Shull v. Rite Aid Corp., 94 Civ. 8552, 1997 U.S. Dist. LEXIS 7609 (S.D.N.Y. May 30, 1997) (six explicitly sexual incidents directed at plaintiff over one year period, along with other incidents indicative of hostility); Pascal, 152 F. Supp. 2d 191 (constant use of sexually explicit language in plaintiff's presence, invitation to strip club, sexually suggestive doctored photo of plaintiff and other incidents were sufficient to survive summary judgment).

In addition to the fact that the alleged incidents were not directed toward Byrne, they are not of sufficient severity or frequency to create an abusive working environment.  The comments Byrne overheard and conduct she learned of second hand were clearly boorish and in poor taste.  However, "conduct that is merely offensive" does not "rise to the level of a hostile work environment." Leibovitz v. New York City Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001) (citation omitted); *see also* Brennan v. Metropolitan Opera Assoc., Inc., 192 F.3d 310, 318 (2d Cir. 1999) ("Isolated, minor acts or occasional episodes do not warrant relief."); Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 62 (2d Cir. 1992) (generally, the harassing incidents must be repeated and continuous); Ogbo v. New York State Dep't of Fin., 99 Civ. 9387 (HB), 2001 U.S. Dist. LEXIS 12920, at *23 (S.D.N.Y. Aug. 28, 2001), *aff'd*, 45 Fed. Appx. 58 (2d Cir. 2002) (five insulting comments made over two year period not sufficient to support claim of hostile work environment).

Beyond that, Byrne has not offered any evidence as to how the objectionable conduct effected her in particular.  Ogbo, 2001 U.S. Dist. LEXIS 12920, at *23-24 (no

hostile work environment absent evidence of adverse impact on the plaintiff's terms and conditions of employment).  Nor does the record suggest that Byrne was hampered in her job or that the terms of her employment were negatively altered as a result of these incidents.  To the contrary, during the time period at issue—April 1, 2001 through 2003—Byrne was promoted twice and experienced pay increases totaling 25.5 percent, from $60,400 to $75,800.

Because Byrne has not established the first element of a *prima facie* case of hostile work environment, summary judgment in Verizon's favor is appropriate.

## C.    Unequal Pay for Equal Work

Byrne claims that she was discriminated against with respect to her pay and compares her salary to that of David Winley (Am. Compl. ¶ 143), and Thomas Spencer (Pl's MOL at 18-19).  She asserts claims under the Equal Pay Act ("EPA") and the HRL.[14]

Both the EPA and the HRL prohibit employers from discriminating against employees on the basis of sex by paying higher wages to employees of the opposite sex for equal work.  29 U.S.C. § 206(d)(1); N.Y. EXEC. LAW ¶ 296(1)(a).   To establish a *prima facie* case of discrimination in violation of either statute, a plaintiff must show that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort and responsibility; and iii) the jobs are performed under similar working conditions."  Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995), *abrogated on other grounds by* Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).  Additionally, claims brought pursuant to

---

[14]  Byrne's claim under Title VII was dismissed for failure to exhaust her administrative remedies.

the HRL require a plaintiff to prove that the pay differential was motivated by a discriminatory intent. Heap v. County of Schenectady, 214 F. Supp. 2d 263, 271 (N.D.N.Y. 2002) (citing Dinolfo v. Rochester Tel. Corp. , 972 F. Supp. 718, 722 (W.D.N.Y. 1997)).

A plaintiff need not prove that her job is identical to that of a higher paid male employee, but must show that the kinds of work being performed are "substantially equal." Mazzella v. RCA Global Comm., Inc., 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986) (EPA) (citations omitted); Smith, 2004 U.S. Dist. LEXIS 14151, at *9 (under HRL, plaintiff need not show that duties were identical, but must demonstrate that individuals used for comparison are "substantially situated in all material respects"). The comparison cannot be based solely on job titles or job descriptions; what matters is the actual content of the jobs performed. Mazzella, 642 F. Supp. at 1551.

Once a plaintiff has made a *prima facie* showing, the burden of persuasion shifts to the defendant to show that the disparity results from seniority, merit, production quotas, or a factor not related to gender. Kaplan v. Multimedia Entm't, Inc., 02-CV-00447, 2005 U.S. Dist. LEXIS 40351, at *35 (W.D.N.Y. Oct. 27, 2005) (citation omitted). Where the employer comes forward with proof of an affirmative defense, the plaintiff may counter that showing by producing evidence that the reason the defendant seeks to advance is actually a pretext for sex discrimination, either unintentional (EPA) or intentional (HRL). Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992).

Both Byrne and Spencer held the titles of Sales Engineer II in Verizon's Buffalo office. Byrne offers no evidence whatsoever about their job duties. David Winley was employed at Verizon from April 2002 through November 2003 in the position of Senior Specialist-Technology Solutions, the title of which was changed in early 2003 to Sales

38

Engineer IV.  During that same time period, Byrne was a Sales Engineer II and, in and after August 2003, Sales Engineer III.  According to Byrne, she was assigned a "projection of sales opportunities" called a "funnel" that "mirrored" Winley's  (Pl's Statement ¶ 72), and she and Winley were "assigned to the same products and services" and shared a "product bucket" (*Id*.  ¶¶ 72, 74; Pl's Appx. Ex. TT; Ex. I at 36:10-14; Ex. J at 70:8-13).  Drawing all inferences in Byrne's favor, the most that can be drawn from this evidence is that Byrne and Winley both had unidentified tasks and responsibilities relating to the same products, services and sales opportunities.[15]

Byrne has not attempted to provide even a minimal description of the kinds of work she, Spencer and Winley[16] engaged in and therefore has not met her burden of a *prima facie* showing of disparity.  Osorio v. Source Enter., Inc., 05 Civ. 10029, 2006 U.S. Dist. LEXIS 63032, at *8-9 (S.D.N.Y. Sept. 1, 2006) (summary judgment warranted where plaintiff failed to offer competent evidence from which trier of fact could infer that individuals to whom she compared herself had substantially similar job responsibilities); Smith, at *9-12 (granting summary judgment where plaintiff failed to adduce even minimal proof that positions were substantially equal); Lemke v. International Total Svcs., Inc., 56 F. Supp. 2d 472, 490 (D. N.J. 1999) (granting summary judgment on ground that shared titles alone is insufficient basis to establish *prima facie* case).

Even had Byrne succeeded in making a *prima facie* showing, Verizon has come

---

[15]  Although Byrne conclusorily states that she and Winley were "essentially assigned to perform the same duties on the same accounts," the evidence she purports to offer (Pl's Appx. Ex. Z) does not support her bald assertion.

[16]  Byrne also mentions Kevin Dean, but provides so little information relative to her purported claim that it does not bear discussion here.

forward with legitimate business reasons for the pay disparities with regard to both individuals. Byrne came to the Enterprise Solutions Group in September 1996 from a union-represented position at Verizon and negotiated a base salary of $55,400. (Def's Statement ¶¶ 13-18.) Spencer came to the Enterprise Solutions Group in 1997 with ten years of management experience at Verizon, would not agree to transfer unless he received a raise, and negotiated a starting salary of $61,300. (Urban Decl. Exs. 27 ¶ 5; 29 ¶¶ 4-6.) In 2003, just prior to her promotion to Sales Engineer III, Byrne's salary had increased 24.4 percent to $68,900 and Spencer's had increased 24.3 percent to $76,200. (Pl's Statement ¶ 107; Urban Decl. Ex. 27 ¶ 5.) Verizon attests that the difference in salaries is due "exclusively to the fact that Mr. Spencer entered [the Enterprise Solutions Group] with a decade of management-level experience under his belt . . . ." (Urban Decl. Ex. 27 ¶ 6.) There is no dispute that, between 1997 and 2003, there was no disparity in the percentage by which their respective base salaries increased. Courts have recognized both greater management experience and the need to increase pay to induce a transfer to be legitimate business reasons for disparities in starting salaries. Fahmy v. Duane Reade, Inc., 04 Civ. 1798, 2006 U.S. Dist. LEXIS 37703, at *27-29 (S.D.N.Y. June 9, 2006) (employer who paid employees with greater managerial experience higher starting salaries had legitimate reason for doing so that was not overcome by plaintiff's assertions that one employee made exaggerated statements on his application and plaintiff had better educational qualifications); Mazzella, 642 F. Supp. at 1551-52 (higher salary justified in part because male employee could not be induced to transfer to new department without salary match).

As for the Winley position, it has been noted previously that Verizon sought to recruit

individuals with "hands-on" voice and data CPE experience following the Bell Atlantic/GTE merger.  Byrne does not dispute that the reason Verizon aggressively set starting salaries at $90,000 for these two jobs was to entice individuals to leave companies that were established in markets with these products to join Verizon.  (Def's Statement ¶ 130; Pl's Statement ¶ 130.)  Attracting new hires in a needed area also has been found to be a legitimate explanation for a pay disparity.  Sobol v. Kidder, Peabody & Co., Inc., 49 F. Supp. 2d 208, 220 (S.D.N.Y. 1999) (need to hire new talent in a particular area to rebuild department was legitimate justification for pay decisions); Manzella, 642 F. Supp. at 1551-52 (company's belief that candidate had certain skills and experience that would be useful in position was legitimate factor).

This Court concludes that Byrne has not demonstrated a *prima facie* case of disparate pay in violation of the EPA or HRL and, even if she had, Verizon has established legitimate reasons for its decisions which Byrne has not overcome with any showing of pretext.  Accordingly, summary judgment is warranted on Byrne's claims of disparate pay.

## IV.  CONCLUSION

For the foregoing reasons, Verizon's Motion for Summary Judgment is granted in part and denied in part.  Specifically, the fourth (HRL hostile work environment), fifth (Title VII retaliation in and after March 2003), sixth (HRL retaliation) and seventh (EPA) claims are dismissed in their entirety.  The second claim (HRL discrimination) is dismissed, except with regard to Byrne's allegation that her promotion to Sales Engineer III was discriminatorily delayed.

Byrne's first and third claims (Title VII discrimination and hostile work environment)

and the remainder of her fifth claim (Title VII retaliation occurring prior to March 2003) were previously dismissed from this action.

In sum, all that remains is Byrne's claim that her promotion to Sales Engineer III was discriminatorily delayed because of her sex in violation of the Human Rights Law.

**ORDERS**

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 43) is GRANTED in part, and DENIED in part.

FURTHER, that the parties shall appear for a settlement conference with the Hon. Leslie G. Foschio, Magistrate Judge, on **May 1, 2007** at **2:00 p.m.**, in Room 310 at the United States Courthouse, Western District of New York.

FURTHER, that if no settlement is achieved, the parties shall consider whether they wish to consent to trial before a Magistrate Judge.

FURTHER, that if no settlement is achieved and there is no agreement to consent, the parties shall appear before the undersigned for a status conference on **May 21, 2007** at **9:00 a.m..**


SO ORDERED.

Dated:        March 28, 2007
              Buffalo, New York



                                        /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                        United States District Judge